## AS TO ANNULMENT OF A MARRIAGE ENTERED INTO BY AN INCOMPETENT.

Common Pleas Court of Hancock County.

ADDIE E. HEATH, AN IMBECILE, BY E. L. GROVES, HER GUARDIAN, v. RAY S. HEATH.*

Decided, 1924.

*Marriage—Invalid ab Initio where one of the Parties is Incompetent to Contract—Ratification and Consummation during Subsequent Lucid Period—Action to Annul Brought by Guardian may be Continued by Subsequent Administrator—Evidence—Presumption Arising from Guardianship and Decree of Lunacy—Relatives Interested in Estate may Testify in Annulment Proceedings.*

1. A void marriage may be declared a nullity either during the lifetime or after the death of the one alleged incompetent to enter into such a contract.

2. Guardianship and a decree of lunacy is prima facie evidence of disability, which shifts the burden and can be removed only by a clear preponderance of the evidence.

3. Evidence that subsequent to the marriage the incompetent became normal and so remained for some time, during which period the marriage was ratified and consumated, must be of a clear and convincing character to give validity to the contract.

4. Where the guardian of a wife under a decree of lunacy brings an action to annul her marriage, pending which the wife dies leaving an estate, the action may be prosecuted by her administrator and a decree nullifying the marriage obtained.

5. In such a hearing the testimony of alienists is of greater weight than that of ordinary associates; evidence of capacity in trifling affairs is not sufficient to support a contract of marriage; relatives of the decedent are competent witnesses, notwithstanding their interest in the estate in a collateral way.

EASTMAN, J.

The petition in this case alleges that on August 31, 1920, the defendant and plaintiff, then living, were married, and that

---

* This case was tried in the Court of Appeals on the same and additional evidence, and a decree was granted voiding the marriage on the ground of constructive fraud.

on August 30, 1921, she was adjudged an imbecile, and a guardian was appointed for her, and that in one day less than one year; that in September, 1921, less than one month after she was adjudged an imbecile, an application was made and she was adjudged a lunatic, and sent to the State Hospital for the Insane at Toledo, and it appears from the evidence that she subsequently died there.

This action to declare the marriage void, was commenced by E. L. Groves, her guardian, and since her death it was revived by her administrator and he is now prosecuting it to conclusion. An answer was filed after the revival attacking the jurisdiction of the court and the capacity of the administrator to maintain the action. The court, Judge Duncan presiding, granted the revivor, and while I believe his order was properly entered, and that it is well sustained by the principle of the cases hereafter cited, yet from the fact that the revivor was made, as I am informed, before the answer was filed, there might be some further question, whether that claim in the answer should not be further considered.

Having examined many authorities upon the question of whether or not a void marriage may be declared to be a nullity either before or after the person alleged incompetent dies, I am of the opinion that it can and should be, and that this case is well sustained by the authorities of Ohio and elsewhere. See Cycl. Dig. Vol. 5, page 35 and 37, on marriage and divorce, and on contracts, same work vol. 3, page 783.

Mental incapacity rendering a party incapable of consent, renders his contract void *ab initio,* and a court will so declare at the suit of the guardian to adjudge such contract a nullity. See *Waymire* v. *Jetmore,* 22 O. S., page 271; *Meyer* v. *Meyer,* 7 O. Dec. (Rep.), page 627; *Clowry* v. *Clowry,* 16 O. C., 302; 8 O. C. D. 652.,

In that case the court had no jurisdiction because insanity was made a ground for divorce in the petition, and insanity is not a ground for divorce, but is a ground for nullification, if the insanity be found to have existed at the time of the marriage, and there was no interval afterward in which the party

could ratify or did ratify. See also *Goodheart* v. *Rawsley*, 11 O. Dec. (Rep.) 655; 10 C. C. 679; 7 C. D. 47. It is competent to hear testimony as to want of capacity, though that may not be a statutory law for divorce, *Vernon* v. *Vernon*, 9 O. Dec. (Rep.) 365. A party claiming an interest in an estate is not a necessary or proper party to the suit. *Waymire* v. *Jettmore*, 22 O. S., 271. See *Vanvalley* v. *Vanvalley*, 19 O. S. 588. Succession of property furnishes no less controlling motive for jurisdiction, 22 O. S., 274.

In the Goodheart case. *supra,* the man was adjudged insane, and afterwards adjudged sane, and the guardian removed; then he married, but the defendant knew of his mental condition; then a second adjudication of insanity and appointment of a guardian occurred and the second guardian brought suit for the annulment of the marriage, and the defendant pleaded affirmance and consummation between June 20 and August 24, 1891, while he was adjudged sane, and claimed the marriage valid in New York, where the contract had been performed. Five months and seventeen days elapsed from the first adjudication to the second, and during the interval he married in the state of New York. Notice the letters on pages 656 and 657. On May 2, 1891, page 658, by letter she broke the engagement because he was insane. This history of the case is as follows: Adjudicated insane and guardian appointed March 7, 1891; (2) Adjudication of sanity and discharge of the guardian August 24, 1891; (3) second adjudication of insanity, and a guardian appointed and a second committal to the asylum November 4, 1891; and at the time of the trial he was a hopeless lunatic. On June 21, 1891 the marriage contract was made while he was under the first decree of lunacy and guardianship, and the presumption of insanity continues to August 24, 1891. The burden was on the defendant to establish the sanity, at the consummation, or at the time the ratification is claimed to have been made, and evidence in this respect must be clear. 11 Am. Ency. 112, and Gangwers estate, 14 Pa. St., 417. Guardianship and decree of lunacy is *prima facia* evidence of disability. Bishop on marriage and divorce

and separation.   Section 1247 to 1249.    See *Reynold* v. *Gerner,*
80 Mo. 474; *Wadsworth* v. *Sherman,* 14 Barber, 469; The
Leonard case, 31 Mass., 280

In *Gordon* v. *Mutual Life Insurance Company,* 24 C. C.
(N.S.), 49, it was held that testimony of alienists will be held
of more weight than that of associates who came in contact
with the parties in business.   Jones on evidence, Volume 2,
page 188.   The burden is shifted by proving insanity.    The
presumption remains unless removed by a clear preponderance
of the evidence.

Question is made regarding the competency of some of the
witnesses to testify, because of their relationship to the de-
ceased, but they are not parties in this case.   In the case of
*Keyes* v. *Gore,* 42 O. S., 211, an action for the recovery of
real estate, children of the deceased were relying on a deed,
and the widow was permitted to testify as to the execution and
delivery of the deed, she not being a party to the suit.   In
*Roberts* v. *Briscoe,* 44 O. S., 596, the original payee of a note
was permitted to testify over the objection of the endorsers.
In *Powell* v. *Powell,* 78 O. S., 331, an administratrix sued a
testatrix of another estate, and the children of the decedent
were held to be competent witnesses, although they were leg-
atees under the will.    Section 11495, General Code, declares
what parties are permitted to testify in such cases. (1) Facts
after death or disability.    (2) Contract made through an
agent, he and the party are competent.    (3) A party or one
having direct interest, having testified to transactions with
another, the other party may also testify.    (4) If a party offers
evidence or conversations or admissions of the opposite party
the latter may testify.    (5) In an action by a partner or a
joint contractor, the adverse party shall not testify to tran-
sactions with, or to admissions by a partner or joint contractor
since deceased, unless they were in the presence of the surviving
partner or joint contractor.    (6) In an action on a book ac-
count a party may testify to the identity of the account. (1)
If after testifying orally, a party dies his evidence may be
proved by either party, and then the other party may also

testify.    (8) If a party dies and his deposition be offered in evidence, the other party may testify to the same matters. In *Leonard* v. *State,* 20 C. C. (N.S.), 340, 3 App. 313, action under 10673, General Code, to recover property, the defendant was held competent to testify.    Parties interested in the events of a suit, but without the power to control the suit are competent witnesses.    *Roland* v *Griffiths,* 6 Dec. (Rep.) 619

Under these decisions, I am certain that the parties are competent to testify. especially since the defendant, Ray Heath went on the witness stand, and voluntarily told his story as to what happened before the marriage, and since the death of Mrs. Heath, and also concerning things that occurred while they were living together, in presence of other parties; but they would be competent anyhow for the reason that the administrator is conducting the suit, and has sole power to control the same, and they are only interested in it in a collateral way.

Now, is the administrator competent to conduct the proceedings?    The action was brought by the guardian of Addie Wilson Heath in her life time, and one cause of action stated in the petition was that she was insane, and not competent at the time of her marriage, and at no time afterwards ever became competent to ratify the same.    Another cause was alleged and a divorce claimed on it.    The divorce part of the action can not be recognized.    The other cause is the same as that alleged in each of the several of the cases cited above, and by a guardian in the same manner.    If a guardian could conduct the proceedings, there is no reason why an administrator could not be substituted in case the ward should die. In fact no one else had authority to settle the affairs of the deceased after her death even to the extent of paying the costs in this action, if it should have been dismissed, and charge the amount thereof to the estate.

It is alleged that there is personal property sufficient to pay the debts, and there is no action pending for the sale of real estate.    No one else than the administrator has authority to pay these debts out of that estate, and no one else has authority to distribute any balance that may remain after the debts

are paid. The question here is whether or not there is a valid contract, which would pass the inheritance from this woman to the defendant, because of that marriage, or to her sister and mother who would be her heirs, if the marriage is not valid. The court had jurisdiction and the guardian was competent to conduct the proceedings. The death removed the guardian from that position and an administrator was substituted. The administrator is competent to proceed.

Now, what should be said upon the evidence as to the capacity of the deceased to enter into a solemn contract, like that of marriage on August 31, 1920, and after that date to the time of her death? It is conceded that if she had contractual capacity at that time or at any time before she was adjudged an imbecile, so that she could and did ratify the contract entered into, the marriage would be valid. A large number of witnesses were examined, and among others five physicians. A brief summary of the facts shown by the witnesses, including the physicians is about as follows:

About 1901, the defendant went to the house of this woman, who was then a widow, roomed there, and became acquainted with her, and went about with her almost continuously, from that time until this marriage took place, in fact he says their courtship began at that time, and this is without dispute. That at different times he was approached by third persons upon the subject of marriage with her, and his reply to several of them was that he did not wish to marry a crazy woman, and that he would marry her if she was not crazy; and it is in evidence also that he was indicted for living with her in open adultery. At this point it is proper to say that the indictment was offered in evidence, and objected to as not competent. The fact was admitted by him, but the indictment itself not being material to the issue is excluded from the evidence, and the objection is therefore sustained. Soon after the time of the indictment he obtained a license and married her, and the indictment was then nollied. The remaining facts are set forth above, as to the marriage, and adjudication, etc. Long prior to the marriage perhaps as far back as July, 1917, when defendant and decedent

were out berry hunting, she was taken violently ill, and he brought her home to her people, and for some time she was unconscious and the symptoms discovered by the persons who cared for her strongly indicate that her trouble was in the brain. The history of her physical condition for many years was that she had a violent venereal disease, lues or syphilis. Several witnesses said that this had been of long standing, and some of the physicians declared that it was progressive, and also that it affected the nerve centers and was finally the cause of her death. All of the symptoms indicate to me that she was gradually developing paresis, and that it had progressed not only in that form, but her bodily tissues had so degenerated long before the time of her marriage that she was incompetent both mentally and physically to do the ordinary work of life in a proper manner. People who tried to have her work for them testified that she was not competent several years before 1920, and one of them who had her employed in the house, together with a sister who also was employed there part of the time, declared that they were obliged to burn the bedding used by her while she was at the house, because of its foul condition.

A restaurant keeper who had her employed to wash dishes declared that she was not competent and was silly a long time before her marriage. One of the doctors who had been called to see her for symptoms indicating a bad cold had examined her mouth and removed the uvula. It was so putrefied that he thought it would fall off and she might swallow it, or to that effect. The justice of the peace who performed the marriage ceremony declared that she was not able to talk so that he could understand her without great difficulty. People who helped care for her declared that at times she would wander out in the middle of the night, sometimes in her night clothing and barefooted, when there was ice and snow on the ground, and others that she had a mania for buying different kinds of goods and frequently purchased dresses that were so large that her mother a large woman could not wear them, she herself, being a small woman, and that she had twenty pairs of shoes at a time, not one of which she had ever put on, and none of which would

have fit her, if she had desired to wear them, and that when she would carry things home from the stores and wake up to the fact that she had purchased them, she would sit down and cry about them, and when she was asked about it she would say that she wished she had not done it. When she visited her sister in Toledo they were in constant turmoil to keep her from wandering in the streets at night and being lost, and frequently hunted for her at from twelve to two o'clock in the morning.

It is true that some of the merchants claimed that she was capable of doing business. No doubt they honestly thought so, but none of them were intimately acquainted with her to the same extent as the people who had constant care and association with her, and who had dealings in other directions. A person may be capable of buying a piece of goods or material for the repair of the house, because there is an association that will prompt such actions in a person otherwise incompetent, but there must be much more capacity in a contract of marriage, than would be sufficient in such trifling affairs. It must be viewed according to the gravity of the situation.

The work of Church & Peters on the subject of the disease with which she was afflicted as related to insanity was cited and used at the trial. It is good authority, but I have taken the pains to obtain the latest work on the subject in Oxford Medicine, Volume 6, beginning on page 493, where Sir Frederick W. Mott has compiled a very exhaustive thesis on the same subject. It is not necessary to go into an exhaustive line of quotations, because the authority he cites so clearly exhibits the symptoms of this case that there can be very little remaining.

The paragraph entitled "Incidents of Nervous Syphilis" clearly indicates the percentage of cases of cerebral syphilis and cerebral spinal syphilis. The paragraph on page 504 under Morbid Anatomy is important, as also that on page 507, Syphilitic Meningitis, and on 509 Syphilitic Arteritis, but most important is the paragraph entitled "Symptomatology of Syphilis of the Brain" and on the same page "Basic Meningitis."

On page 513 the paragraph relating to ''Physical Disturbances'' describes conditions almost identical with the condition described by the witnesses in this case, when the evidence is read with the statements of the physicians in mind. In the last part of the paragraph we have the following words: ''The dementia of syphilitic brain disease is characterized by being partial and recurring in attacks; it does not alter the character and personalty of the individual to the same extent as in the dementia of general paresis. He preserves his autocritical faculties and is conscious of his intellectual deficit, and he is by no means indifferent to his mental and bodily condition. He may suffer from loss of memory, especially of recent events and his knowledge of time and place may be defective. He is subject to sudden fits of excitation with motor restlessness or of depression with suicidal tendencies.'' There are other phases described which more particularly apply to this case.

On page 514, under ''Convulsive Attacks'' we have the following: General convulsions of an epileptic character, unilateral, or partial epileptiform seizures are not infrequent, and I have seen a case in which tentaniform spasm and opisthotonos occurred, but then the meningitis was found *post mortem* to have affected the posterior fossa and the spinal cord. General tremor is not infrequently met with in the severe fatal cases occurring in asylums.'' Much more might be quoted.

I can not avoid the opinion therefore in that this woman was wholly incompetent at the time the marriage was contracted to enter into such an obligation, and in addition to the evidence presented and reviewed above and from the fact that she having the opportunity to be respectable, and having plenty of property with which she could have kept herself with but little effort, she lived with this man for many years in defiance of the scandal in the community, and without regard of the wishes of her relatives and friends. She must have been in a serious state of mental decline from the time she began such relationship until the end of her days.

During the trial the evidence developed that the defendant had been married three times before he married Addie Wilson,

and that he was a married man all of the time that he was living with her from 1901 until the day of her death, and subsequent facts show that he still is a married man, for he has failed to show any proper cancellation or nullification of his marriage to Sabina Isabelle Brown, which occurred in 1892. There was no allegation in the petition that he was incompetent at the time of his alleged marriage, but upon development of these previous marriages in the testimony, leave was granted to the plaintiff to so amend the petition, as to set forth that allegation and to the defendant to answer to that allegation. The case was adjourned for the purpose of enabling him to prove the divorcement from his first and third wives, and the death of the second. Some proof has been offered as to the death of the second wife, and I think the court should find that she died about 1906, although there is a discrepancy in the name given by the authorities where she died, it not being identical with the name given by him in his testimony.

The Wapakoneta divorce was proved. As to his marriage with Isabella Brown he now attempts to introduce testimony to show that the marriage was not valid when contracted, and for confirming such testimony, the record of birth, of Saphira E. Brown is introduced, and the depositions of persons who claim to have known Henry Brown and Serah Fox Brown, the parents of Isabelle, to the effect that this Saphira E. Brown and Sabina Isabelle Brown are the names of the same person. An objection is made to the competency of this testimony to contradict a record, and also the contradiction of the record of his application for the license under which he contracted marriage with Miss Brown.

Cases are cited by his counsel to sustain the proposition, that if the marriage was null and void in the beginning, because of the incompetence of either party, it might be ignored at any time before competence arose. It is indeed true, that the marriage of a girl at that time under 16 years of age was absolutely void, and that a man who was married under the lawful age had the right at the arrival of maturity, before ratification to ignore such a marriage. But, it becomes a question

of the competence of proof. Section 1594 General Code, Sub-
Section 10 relates to marriages. *Warwick* v. *State*, 25 O. S.,
page 21, declares that a deputy may administer an oath on ap-
plication for marriage license, and perjury may be assigned on
such oath. *Staight* v. *State*, 39 O. S., 496, the court holds
that the marriage application affidavit is a subject of perjury
under Section 533 of the Revised Statutes which is identical
with Section 1584 of the Code, and the facts upon the charge
were based upon the age of the girl, as they are in this case.
The defendant escaped because the deputy was not duly author-
ized to administer an oath, not having been appointed as
deputy clerk to the Probate Judge after his previous term had
expired, and yet the court said that oath was good, as to third
persons because the officer was acting *de facto*.

Now, at the time the defendant Heath made application to
marry Isabelle Brown her mother, then lived in Findlay, Ohio,
and Ray Heath both made affidavit that this girl, Sabina Isa-
belle Brown, was over 16 years of age. While the application
was not as clearly made out as it might have been, yet it is
sufficiently clear to note her age in unmistakable terms. The
blank on the one signed by Heath is made clear by the marginal
note, and the statement of Mrs. Martin.

Can this be disputed now? If so, what evidence is admissible
for that purpose? It is clear that the Probate Judge is re-
quired to keep those records, for the protection of the public,
as well as the parties. Those records can be disputed only as
provided by the statutes themselves. Section 12211 *et seq,*
provides a proceeding for the correction of a record. This pro-
vision is exclusive. At the time of this marriage, this Section
was 5868 of the Revised Statutes. The presumption was raised
against the defendant, by his consorting with Bell Brown, as
his wife. It was strengthened by the proceedings, and the
record shows her age, to the extent that it is very difficult
to impeach and impeachment must be according to law.

But who was best qualified to know the age of Belle Brown.
Her mother probably knew more about the girl's age than any-
body else. She made oath to it, many years ago, and upon
that oath a license issued, and marriage contracted, and there

has been no lawful proceeding entered as far as this court knows to nullify that marriage or correct the record in any way. The birth record shows a different name, and an effort is made to identify Sabina and Saphira E. Brown as the same person. It is doubtful whether depositions can be admitted to do that, in a collateral action like this, and if they can be, the means of knowledge of the deponents seems too vague to accept in contradiction of a record made so long ago, and I do not think the identity sufficiently established.

Henry Brown had thirteen or fourteen children, and there is no evidence that his third wife, Serah Fox, did not bear one or more children who died in infancy, and there is no way to know but that this Saphira E. Brown might have been one of them. Furthermore, it is not clear that it is the same Henry Brown and Serah Fox, and the proceeding which recorded that birth is a matter of record required by law, and the proof must be specific and clear, in order to correct or impeach the same.

Amelia Brown, whose deposition is offered to prove Isabelle's age, bases her statement on a comparison of this girl with hers, and Mrs. Coates' opportunity to know was that she was once married to a half brother and was acquainted with the girl.

These statements are too weak to contradict the record in this kind of preceeding.

After Heath admitted his marriage to Belle, the burden to show that marriage at an end was for him, and the mere fact that Belle consorted with another man raises no presumption in his favor here, and the burden has failed, and that failure makes it imperative on the court to hold that this marriage with Addie Wilson was void on that account. The marriage is held to be a nullity on both grounds.